# Coleman *v.* Siler.

*Special Action on the Case, by Landlord, against Purchaser of Tenant's Crop with Notice of Lien.*

1. *Waiver or abandonment of landlord's lien for rent.*—The landlord's lien on his tenant's crops, for rent, is not waived or impaired by taking the tenant's note with personal security; neither is it waived or abandoned by his consent to the removal of the crops from the premises.

2. *Agreement construed, as to conflicting claims of landlord and merchant making advances.*—Under a written agreement beween a landlord, claiming a statutory lien on his tenants' crops for rent and advances, and a merchant claiming a statutory lien for advances, by which it is stipulated that P., the merchant, "is to get today three bales of cotton (two from Henry, and one from Nathan), *less the rents,* and out of the next lot of said Henry and Nathan S. [landlord] is to get two-thirds, provided it does not exceed their indebtedness to him for the year 1881, and so on until both claims are settled;" the lien for rent is expressly reserved and retained on the three bales delivered to the merchant, and the landlord's lien for advances is, by necessary implication, abandoned as to those bales; while, as to the residue of the bales raised by the tenants named, two-thirds thereof is made subject to his claim for rent and advances, but only during the year 1881.

3. *Parol agreement varying writing.*—The terms of a written agreement can not be varied by proof of a contemporaneous verbal agreement, though a subsequent verbal agreement might be proved.

4. *Waiver of landlord's lien for advances.*—When a landlord agrees and promises, by letter addressed to a merchant, not to make any advances to his tenants if the merchant will furnish them with supplies, this necessarily postpones and subordinates his lien for any advances afterwards made to them, to the merchant's lien for advances made on the faith of the letter; and in a controversy between him and a purchaser from the merchant, he can not claim to appropriate any part of the proceeds of sale of the tenant's crop to his lien for such advances, until the merchant's lien is fully paid and satisfied.

5. *Sale by agent.*—Authority to an agent to sell personal property, only authorizes him to sell for money; and if he sells in satisfaction of his own debt, no rights are conferred or acquired by the sale, but he and the purchaser are guilty of a joint conversion.

6. *Variance.*—Under a complaint claiming damages for the defendant's sale and conversion of a crop raised on rented lands, with knowledge of plaintiff's statutory lien as landlord for rent, whereby the lien was destroyed and lost, a recovery can not be had on proof of a statutory lien for advances.

7. *Witness; effect of testimony, as against party introducing.*—As a general rule, a party can not impeach the general reputation or credibility of a witness introduced by him; yet it can not be asserted, as matter

[Coleman v. Siler.]

of law, that the testimony of a witness must always be taken most strongly against the party by whom he was introduced.

APPEAL from the Circuit Court of Pike.

Tried before the Hon. JOHN P. HUBBARD.

This action was brought by Q. P. Siler, against W. S. Coleman and J. S. Carroll, to recover damages for an alleged sale and conversion by the defendants of four bales of cotton, grown on rented lands belonging to the plaintiff, and on which he claimed a statutory lien for rent, whereby said lien, of which he alleged the defendants had notice, was lost and destroyed; and was commenced on the 21st March, 1882. The complaint alleged that the four bales of cotton were grown, during the year 1881, by Sharper McKee, Henry Williams, and Nathan Austin, on lands rented to them by the plaintiff for that year, at the stipulated rent of one-third of the cotton, and one-fourth of the corn raised. The record does not show what pleas were filed; but the cause was tried on issue joined, and there was a judgment on verdict for the plaintiff, for $134.27.

The plaintiff, testifying as a witness for himself on the trial, as the bill of exceptions shows, stated the terms of the contract for rent as alleged in the complaint, and further testified, that said Nathan, Henry and Sharper had rented the same lands from him for the year 1880; that Nathan failed to discharge his indebtedness for advances that year by $52.38, which balance was carried forward into his account for 1881; that Henry failed to pay his entire indebtedness for that year, and left a balance of $5.36 unpaid, which was carried forward into his account for the next year; "that he had made advances, during the year 1881, $60.05 to Sharper, $29.50 to Nathan, and $29.25 to Henry; that he had been paid all amounts due him for rent and advances, except $58.75 for advances, and $79.58 for rent, making in all $138.33." He also stated, on cross-examination, "that he had received from said tenants, out the crop of 1881, two bales of cotton from Henry, one bale from Nathan, and one from Sharper; that he had also received, in cotton, $40.15, and $36.26, besides $20.38 in money; that defendants had also paid him some money, but he could not say how much, and Pennington & Co. had paid him some money, but he could not. say how much." He testified also, on cross-examination, "that Sharper McKee continued his tenancy during the year 1882, and being asked if said Sharper did not, out of the crop of 1882, pay him the entire balance due for rent and advances the previous years, replied, that he did not know—that Sharper had paid him a few dollars, but he did not know how much." Said Sharper, being afterwards introduced as a witness by the plaintiff, testified that, at the expiration of the year 1882, "he had

a final settlement with plaintiff, and paid him all amounts which he owed him, on rents and advances, for the previous years."

The four bales of cotton which the defendants had received and sold, were bought by them from J. A. Pennington, or Pennington & Co., who held crop-lien notes and mortgages for advances made by them, during the year 1881, to said Sharper, Nathan, and Henry; and it was proved that, of these four bales, two were raised by said Henry, and one by said Nathan, but the evidence was uncertain as to the fourth bale. It was not denied that said defendants and Pennington each had notice that these bales were raised by said tenants on lands which they had rented from the plaintiff: but said Pennington testified as a witness for the defendants, "that he refused to make any advances to said tenants, unless plaintiff would obligate himself not to furnish them anything during said year 1881;" that the plaintiff thereupon sent him a letter to that effect, which was produced and read in evidence; and that he afterwards furnished supplies to said tenants, taking crop-lien notes and mortgages as security, on the faith of that letter. The letter was dated January 26th, 1881, and in these words: "By request of the tenants on my Oak Grove place, I hereby state to you, that I will not advance anything to them this year; I mean Sharper McKee, Harvey Austin, Nathan Austin, and Henry Williams. I do this freely. I did not know you wanted me to say this, or I should have stated in the note I wrote you in regard to the terms of rent agreed on between us."

The witness Pennington further testified, "that when the crops of said tenants were made, and were being brought to market, he learned that plaintiff was claiming against each an amount for advances, in addition to rent, and that his lien was superior to that of witness, and that he must be paid for such advances, as well as rents, before witness was paid anything; that this caused a disagreement between him and the plaintiff, which was settled by an agreement in writing." This agreement, which was produced and read in evidence, was signed by plaintiff and said Pennington & Co., was dated September 22d, 1881, and in these words: "We both agree to the following agreement: that J. A. Pennington is to get three bales of cotton (two from Henry Williams, and one from Nathan Austin) to-day, less the rents; and out of the next lot of said Henry and Nathan, Q. P. Siler is to get two-thirds, provided said two-thirds does not exceed their indebtedness to him for the year 1881; and so on, until both claims of said Pennington and Siler are settled." Said witness testified, also, "that after said agreement was entered into, as above stated, plaintiff turned over to him the warehouse receipts for the three bales of cotton, and he

turned them over tô the defendants; that it was further agreed between them, at the same time, that witness was to receive the cotton of said McKee, Austin and Williams, and was to sell the same, and leave plaintiff's share with said defendants; that he did sell such of the cotton of said tenants as came to his possession, and left the money for plaintiff's share, except one heavy bale, which he delivered to plaintiff through one Ben. Smith, and $20.65 in money which he paid to plaintiff; that he sold said three bales to defendants, and left plaintiff's share with them; that the manner of all the sales was thus: defendants took the cotton at market price, and credited witness with the amount, or applied it to the payment of witness' indebtedness with them previously contracted; that the fourth bale, which weighed 472 lbs., and which was also covered by said agreement of September 22d, was afterwards received by him, and was sold to said defendants, and plaintiff's share left with them; and that he had not been paid, out of the crops of said tenants or otherwise, the amount advanced by him to them."

These being the material facts, though there was other evidence introduced by each party, the court charged the jury, among other things, "that if the defendants bought the cotton from Pennington, and paid for it by giving him credit on a previously subsisting debt due to them from him, then they would not be purchasers for value in this case, and would not be protected thereby, if otherwise liable;" also, "that the contract of September 22d did not affect the lien of either plaintiff or said Pennington, but only regulated the proportion and manner of payment between them;" and "that, if plaintiff made advances to each of said tenants, and they made payments to him, but did not direct the application of said payments, then plaintiff had the right to apply said payments to the advances due to him; and if he did so apply them, and they did not discharge said debt for advances, then defendants are liable for the value of plaintiff's rents, to the extent of the cotton received by them with notice of said tenancy."

The defendants excepted to each of these charges, and then requested eighteen separate charges, which were in writing, and each of which was refused by the court, exceptions being duly reserved to the refusal. Among the charges so refused were the following:

1. "When a party introduces a witness, and has him sworn and examined, he thereby indorses such witness as credible; and if Sharper McKee, plaintiff's witness, testified that he had paid plaintiff all he owed him both for rent and advances, including balances for the year 1881, this evidence must be taken most strongly against the plaintiff; and if the jury are reasonably satisfied that said Sharper has paid such rents and advances,

[Coleman v. Siler.]

this takes Sharper's crop out of the case, and they must then look, in determining the question of indebtedness, to the two remaining tenants, Austin and Williams; and if the jury believe, from the evidence, that their indebtedness for the year 1881 was paid, then, under the written contract in evidence, they must find for the defendants."

2. "That the written contract of September 22d must determine the liability of the defendants; that, by that contract, plaintiff and Pennington both waived their liens, and undertook and agreed to divide the crop of cotton of said Austin and Williams between themselves, and, having done this, plaintiff can not recover against defendants in this action."

3. "If the jury believe, from the evidence, that plaintiff directed Pennington to sell the cotton, and to leave his portion of the rents with defendants, and that Pennington did so, then such amounts, so left with defendants in pursuance of such instructions, were payments *pro tanto*, whether defendants paid them to plaintiff or not."

4. "If the jury believe, from the evidence, that the defendants bought said cotton from Pennington, and that Pennington had authority to sell it, then they must find for the defendants."

5. "Under the agreement or contract of September 22d, the jury can not consider any indebtedness of Austin and Williams for the previous year, namely, 1880."

6. "If the plaintiff has been paid for the rents, for which he seeks to recover in this suit, then he is not entitled to recover, and it makes no difference whether Sharper McKee paid a portion of it; and if, taking into account the amount paid by said Sharper, if any thing, the jury are unable to determine the amount really due on account of rent or advances, or both, from the other tenants, then they must find for the defendants, provided Sharper has paid in full."

7. "Before plaintiff can recover in this suit, he must show that something is due him for rent, and must show the amount with reasonable certainty."

The charges given, and the refusal of the several charges asked, are now assigned as error.

GARDNER & WILEY, for appellants.

M. N. CARLISLE, *contra.*

SOMERVILLE, J.—There seems to have been a needless multiplicity of instructions demanded of the court by the appellant's counsel, in the trial of this cause below, especially in view of the very few elementary principles which, in our judg-

[Coleman v. Siler.]

ment, should have controlled the decision of the jury in forming their verdict.

The action is one on the *case*, brought by Siler, as landlord, claiming damages for the loss or destruction of his lien for *rent* on four bales of cotton, purchased and shipped by defendants with a knowledge of plaintiff's lien. The defendants claimed as purchasers from one Pennington, who held a mortgage or crop-lien upon the cotton, executed to him by the lessees, or tenants. It is not denied that both the mortgagee and the defendants had notice of the plaintiff's lien. This seems to have been conceded throughout the progress of the trial. It is contended, however, that there was a *waiver*, or abandonment of the landlord's lien ; and this is the controlling point of controversy in the case.

Whether such a lien is waived, or not, is chiefly a question of intention, to be determined, like other questions of fact, by the circumstances of each particular case. This court has held, that such a lien is not impaired, as a vendor's lien would in like case presumptively be, by the landlord's taking from the tenant a note with *personal security* for the payment of the rent. *Denham v. Harris*, 13 Ala. 465. Neither, as expressly adjudged, will the mere consent of the landlord to the *removal* of the crops from the premises, without more, operate as a waiver.—*Tuttle v. Walker*, 69 Ala. 172. Before the law will authorize such intention to be inferred, the rule is, that it must be made obvious by plain proof.

What may have been the effect of the plaintiff's letter written to Pennington, on January 26th, 1881, in which he obligated himself not to furnish advances to his tenants if Pennington would furnish them,—so far, at least as it immediately concerns the four bales of cotton in controversy—we need not just here decide. This was a matter of contention between them, which was intended to be settled by their subsequent written agreement, made in September, 1881,—a proper construction of which must chiefly determine the relative rights and conflicting priorities of the parties litigant.

It is shown that the plaintiff originally had a claim against his tenants, not only for rent, but also for advances made under the provisions of the statute.—Code, 1876, § 3467. These advances, not less than the rent, constituted a lien in favor of the plaintiff upon the crops grown on the rented premises, each equal in dignity to the other, unless there was some fact which would operate as a loss, waiver, or abandonment of this statutory right.— *Wilson v. Stewart*, 69 Ala. 302. The main question is, how far this result was effected by the written agreement executed in September.

The clear purpose of this agreement was to modify, and, to

some extent, abate the claims of the plaintiff, as secured to him by the statute. It was stipulated, that Pennington was to get, in the first place, *three* bales of cotton, two of which were to be delivered by the tenant Williams, and the other one by Austin, on that day; and it was agreed that he was to take these three bales, "*less the rents.*" We construe this to mean, *subject to the lien of the* RENTS as such, and not the advances. In view of the controversy previously existing between the parties, as to the relative priority of their respective claims for *advances*, it is obvious that the retention specifically of a lien for rent, *eo nomine*, is an exclusion of that for advances on *these particular three bales of cotton.* The maxim obviously applies, *Expressio unius est exclusio alterius.*

The evidence, we repeat, tends to show that these three bales of cotton went into the hands of the defendants, with full knowledge of plaintiff's lien.

The agreement under consideration, in the next place, makes provision as to the *remainder* of the cotton to be received from the same two tenants, Williams and Austin. It makes no reference to any other cotton, such as might be received, if any, from McKee, or the other tenant. *Two-thirds* of this remainder only is made subject to plaintiff's lien, and this is limited to rent and advances for the *year 1881;* or, in other words, to the indebtedness of these tenants for advances made during this year, and any balance of the entire rent which might remain unsatisfied by the three bales of cotton first mentioned.

If *McKee* owed the plaintiff any advances, such indebtedness would not fall within the influence of this agreement, in whatever particular year these advances may have been made. Nor would the agreement itself embrace any indebtedness held by plaintiff against his tenants for any other year than 1881. Nor, again, would parol evidence be admissible, to show a *contemporaneous* agreement of the contracting parties that such should be the case, although a *subsequent* verbal agreement might be proved, which would have this effect. It does not appear, however, that any one of the four bales of cotton in controversy was raised by McKee. The evidence tends to show that they were all covered by the stipulations of the written agreement.

It is insisted as a defense to this action, that the complaint declares only upon the lien for *rent*, and that the rent was paid. The argument is, that plaintiff's lien for rent, at least on the cotton grown by McKee, was superior to his lien for advances, and that he was compelled to appropriate all cotton received from McKee to the satisfaction of this superior lien. This aspect of the case requires us to construe the effect of plaintiff's letter to Pennington, in which he agreed not to ad-

[Coleman v. Siler.]

vance to McKee and the other tenants, if Pennington would do so. This letter has no bearing on that portion of the cotton received from Williams, or from Austin. That is governed by the subsequent agreement of September 22, 1881, to which we have above alluded.

The clear effect of the *letter* in question was to *subordinate*, or postpone, the plaintiff's lien for *advances*, to any advances made by Pennington on the faith and strength of its assurances. It conferred on Pennington, in other words, a priority of lien for his *advances*, over the *advances* made by the plaintiff for the same year—1881. The agreement of September modified this priority of lien, only so far as it affected the cotton received from Williams and Austin. It did not modify, or limit it, so far as it attached to, or concerned the portion of the crop received by plaintiff from McKee. This, as we have said, must rest upon different grounds, because it is not covered by the stipulations of the September agreement. We are of opinion that the plaintiff was precluded from appropriating any portion of the cotton raised by McKee to the satisfaction of his claim for advances made in the year 1881, until Pennington's claim for advances, made the same year, was fully satisfied.

The rulings of the court are not in harmony with the foregoing views, as is clearly apparent from the refusal of several charges requested by the appellant's counsel.

It is almost needless to add, that the authority given by plaintiff to Pennington, to sell certain cotton to the defendants, was an authority to sell only for *money*, or *cash*. It gave no authority to appropriate the cotton in satisfaction of his personal debts due to the defendants. When he undertook to do this, he and the defendants were guilty of a joint conversion of the plaintiff's property, and no title to the cotton was conferred by the one wrong-doer, or acquired by the other. It is well settled, that no special agent, who is authorized to sell, can pay his own debts with the property of the principal.—*Burks v. Hubbard*, 69 Ala. 379; Benj. on Sales, § 742.

It appears from the pleadings in the case, that the plaintiff claims a lien based only on a debt due him as *rent*. The evidence tends to show that a part of the sum claimed was for *advances ;* and although the lien of the two is of the same dignity, because made so by the statute when due to the landlord, yet the one is essentially distinct from the other, and the matter of description is material. Notice of the relation of landlord and tenant, for example, operates as constructive notice of rent, but not of advances.— *Wilson v. Stewart*, 69 Ala. 302. Where the plaintiff declares upon a lien for rent, he can not recover upon one for advances. The variance would be fatal, and the court erred in refusing to so charge the jury.

[East Tenn., Va. & Geo. R. R. Co. v. Clark.]

It is a general rule, liable to some exceptions, that when a party introduces a witness in proof of his case, he represents him as being worthy of belief, and the law will not permit him afterwards to impeach the witness' general reputation for truth, or to impugn his credibility by general evidence tending to show him to be unworthy of belief.—1 Greenl. Ev. § 442. But it can not be said, as matter of law, that, in all cases, the testimony of a party's own witnesses must be always taken most strongly against him. The witness may exhibit a degree of bias against the party offering him, and of manifest partiality for the adversary party, such as to authorize the jury to give very slight weight to his testimony, either for or against either party. The court very properly so declared the law in the present cause.

There are some other phases of the case, which we decline to consider, as they will not probably arise again upon a second trial.

The judgment is reversed, and the cause remanded.